Filed 6/30/15

# CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| DELTON R. FAIR,<br><br>　　　　Plaintiff and Respondent,<br><br>　　　　　　v.<br><br>BNSF RAILWAY COMPANY,<br><br>　　　　Defendant and Appellant. | F068769<br><br>(Super. Ct. No. 11CECG04269)<br><br><br>**OPINION** |

　　　　APPEAL from a judgment of the Superior Court of Fresno County.  M. Bruce Smith, Judge.

　　　　Dowling Aaron, Steven M. Vartabedian; Flesher McKague, Jacob D. Flesher, Jason W. Schaff; BNSF Railway Company, Wayne L. Robbins, Jr.; Kelly Hart & Hallman and Marianne M. Auld for Defendant and Appellant.

　　　　Law Offices of Ruel Walker, W. Ruel Walker; Hildebrand, McLeod & Nelson, Anthony S. Petru and Kristoffer S. Mayfield for Plaintiff and Respondent.

-ooOoo-

---

　　　　[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part[s] III-VI.

Plaintiff Delton R. Fair was working on the railroad. After he injured his back and knee while trying to throw a switch, he brought this action against BNSF Railway Company (BNSF) under the Federal Employers' Liability Act (FELA) (45 U.S.C. § 51 et seq.), alleging that he was injured as a result of BNSF's negligence. A jury found in Fair's favor and awarded him a total of $3,216,000 in damages.

BNSF's primary argument on appeal is that the Federal Railroad Safety Act (FRSA) (49 U.S.C. § 20101 et seq.), and the regulations promulgated thereunder, preclude Fair's FELA claim in its entirety. In support of its argument, BNSF relies on the authority of several federal appellate courts. Guided by recent court decisions that have reanalyzed the preclusion issue in light of the United States Supreme Court's recent decision in *POM Wonderful v. Coca-Cola Co.* (2014) ___ U.S. ___, 134 S.Ct. 2228 (*POM Wonderful*), we reject BNSF's argument, and instead conclude that FRSA and its regulations do not preclude federal claims under FELA. We reject BNSF's other contentions in the unpublished portion of the opinion.

### FACTUAL AND PROCEDURAL BACKGROUND

In the early hours of January 27, 2011, 46-year-old Fair was working as a "herder" in BNSF's Fresno railroad yard, attaching together a group of locomotives. At about 1:30 a.m., he injured his back when he tried to throw the 5176 switch;[1] pain immediately shot into his leg and up his back. When he tried to walk the pain off, his knees went out from under him; his left knee was injured when it hit what Fair believed was the edge of a railroad tie.

In December 2011, Fair brought this action for damages against BNSF under FELA. The case was tried to a jury in September 2013. The jury returned a special verdict finding BNSF negligently caused Fair's injuries and awarded the following:

---

[1] A switch is a track apparatus designed to allow trains or cars to move from one track to another. The switch is operated by manually moving, or throwing, a handle from one side to the other, which moves a connecting rod.

(1) $236,000 for past economic loss; (2) $1,500,000 for future economic loss; (3) $300,000 for future medical expenses; (4) $380,000 for past noneconomic loss; and (5) $800,000 for future noneconomic loss.

BNSF moved for a new trial, asserting, among other arguments, the same arguments it pursues in this appeal. The trial court denied the motion, and BNSF filed this timely appeal.

As necessary, other relevant facts are included in the discussion that follows.

## DISCUSSION

### I. FELA Overview

While injured employees in California generally are entitled to workers' compensation benefits regardless of whether the employer was at fault (Lab. Code, § 3200 et seq.), those benefits are not available to *railroad* employees who suffer on-the-job injuries. Instead, their right of recovery is governed by FELA, which permits recovery only if the employer acted negligently. (*Lund v. San Joaquin Valley Railroad* (2003) 31 Cal.4th 1, 6 (*Lund*); *Bergman v. St. Louis Southwestern Ry. Co.* (1982) 134 Cal.App.3d 696, 700-701 [noting a railroad is not strictly liable for its employee's injuries; instead, the employee must prove the employer was negligent].) A FELA action may be brought in either federal or state court. (*Lund, supra,* 31 Cal.4th at p. 6; see also *Kinsey v. Union Pacific Railroad Co.* (2009) 178 Cal.App.4th 201, 204.) "When, as here, a FELA action is brought in state court, state law governs procedural questions, while federal law governs substantive issues. (*St. Louis Southwestern R. Co. v. Dickerson* (1985) 470 U.S. 409, 411.) State procedure does not apply, however, if it results in the denial of a federal right granted by Congress." (*Lund*, *supra*, 31 Cal.4th at pp. 6-7.)

Under FELA, a railroad employee has the right to sue his or her employer for "such injury . . . resulting in whole or in part from the negligence" of the railroad or its employees. (45 U.S.C. §§ 51, 56; *Woods v. Union Pac. R. Co.* (2008) 162 Cal.App.4th 571, 577 (*Woods*).) FELA was enacted "because the Congress was dissatisfied with the

3.

common-law duty of the master to his servant. [It] supplants that duty with the far more drastic duty of paying damages for injury or death at work due in whole or in part to the employer's negligence." (*Rogers v. Missouri Pac. R.R. Co.* (1957) 352 U.S. 500, 507 (*Rogers*), fn. omitted.) "FELA imposes upon a railroad a continuing and nondelegable duty to use reasonable care to provide railroad employees a safe place to work." (*Woods*, *supra*, 162 Cal.App.4th at p. 577.)

The standard under FELA is a relaxed one; to prove that a railroad breached its duty, a "plaintiff must show circumstances which a reasonable person would foresee as creating a potential for harm [and] then show that this breach played any part, even the slightest, in producing the injury." (*McGinn v. Burlington N.R. Co.* (7th Cir. 1996) 102 F.3d 295, 300.) "It is well established that the quantum of evidence required to establish liability in an FELA case is much less than in an ordinary negligence action." (*Harbin v. Burlington Northern R. Co.* (7th Cir. 1990) 921 F.2d 129, 131.) If the negligence of the employer "played *any part, however small,* in the injury," the employer is liable. (*Rogers, supra,* 352 U.S. at pp. 507-508, italics added.) Neither assumption of the risk nor the contributory negligence of the employee bars recovery, if the injury was at least in part the result of the employer's negligence. (45 U.S.C. §§ 53, 54.)

## II. FRSA Preclusion

BNSF first contends Fair's FELA claim is precluded completely by FRSA and its regulations. Before trial, BNSF moved in limine to preclude Fair from establishing his FELA claim based on conduct that complies with regulations promulgated pursuant to FRSA. BNSF argued that in light of the preclusive effect of FRSA, the regulation that addresses switch inspections, 49 Code of Federal Regulations section 213.235, effectively set the standard of care in this case. BNSF thus contended that Fair should be precluded from offering any evidence that the relevant standard of care required more frequent inspections than that set forth in the regulation or that inspections be conducted in a particular manner. In opposing BNSF's motion, Fair argued that while FRSA

4.

preempts state law claims covered by its regulations, it does not preclude federal claims under FELA. Fair also argued his negligence claim encompassed conduct that was not covered by the switch inspection regulation.

The trial court denied BNSF's motion based on the reasoning in an unpublished decision from the Eastern District of California, *Powell v. Union Pacific Railroad Co.* (E.D. Cal. 2013) 2013 WL 1857893, in which that court determined the same FRSA switch inspection regulation did not preclude the plaintiff's FELA claim based on the railroad's failure to inspect a switch more frequently than once a month.[2]

At trial, Fair presented evidence on, and argued, several theories of negligence. Specifically, Fair argued BNSF was liable for his injuries if the jury found either (1) BNSF did not uphold its duties to properly inspect and maintain the switch, or (2) an employee damaged the switch by running through it, thereby bending the connecting rod, but failed to report it.

On appeal BNSF contends the trial court erred in finding preclusion did not apply. The parties agree that whether FRSA precludes Fair's FELA claim presents a question of law governed by the de novo standard of review.

FRSA was enacted in 1970 with the stated purpose of "promot[ing] safety in every area of railroad operations and reduc[ing] railroad-related accidents and incidents." (49 U.S.C. § 20101.) While FELA is a general negligence statute that neither prohibits nor requires certain conduct by the railroad, FRSA proscribes railroad conduct by empowering the Secretary of Transportation to implement comprehensive and detailed railroad safety regulations. (*Waymire v. Norfolk and Western Ry. Co.* (7th Cir. 2000) 218 F.3d 773, 775 (*Waymire*); 49 U.S.C. § 20103.) The Secretary of Transportation has

_____

[2] BNSF renewed the preclusion issue when arguing for a directed verdict both after Fair rested his case and at the close of all the evidence. The trial court denied both motions.

delegated this authority to the Federal Railroad Administration (FRA).  (*Union Pac. R.R. Co. v. Cal. Pub. Utils. Comm'n* (9th Cir. 2003) 346 F.3d 851, 858, fn. 8.)

In a section addressing the preemption of certain state laws, FRSA provides that "[l]aws, regulations, and orders related to railroad safety . . . shall be nationally uniform to the extent practicable."  (49 U.S.C. § 20106(a)(1).)[3]  To maintain such uniformity, FRSA contains an express preemption clause, pursuant to which "[a] State may adopt or

[3] Section 20106, entitled Preemption, reads in its entirety:  "(a) National uniformity of regulation. [¶] (1) Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable.  [¶] (2) A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement.  A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order – [¶] (A) is necessary to eliminate or reduce an essentially local safety or security hazard; [¶] (B) is not incompatible with a law, regulation, or order of the United States Government; and [¶] (C) does not unreasonably burden interstate commerce.

(b) Clarification regarding State law causes of action.  [¶] (1) Nothing in this section shall be construed to preempt an action under state law seeking damages for personal injury, death, or property damage alleging that a party – [¶] (A) has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), covering the subject matter as provided in subsection (a) of this section; [¶] (B) has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by either of the Secretaries; or [¶] (C) has failed to comply with a State law, regulation, or order that is not incompatible with subsection (a)(2). [¶] (2) This subsection shall apply to all pending State law causes of action arising from events or activities occurring on or after January 18, 2002.

(c) Jurisdiction.  Nothing in this section creates a Federal cause of action on behalf of an injured party or confers Federal question jurisdiction for such State law causes of action."

Subsequent references to section 20106 shall be to 49 United States Code section 20106.

continue in force a law, regulation, or order related to railroad safety . . . until the Secretary of Transportation (with respect to railroad safety matters) . . . prescribes a regulation or issues an order covering the subject matter of the State requirement. . . . " (§ 20106(a)(2).) FRSA preempts covered state law tort claims, in addition to covered statutes and regulations. (See *CSX Transp., Inc. v. Easterwood* (1993) 507 U.S. 658, 664, 670-671 (*Easterwood*). A FRSA regulation covers and thus preempts a state law tort claim if it "substantially subsume[s] the subject matter" of that claim. (*Easterwood*, *supra*, 507 U.S. at p. 664; see also *Norfolk Southern Ry. Co. v. Shanklin* (2000) 529 U.S. 344, 352.)

In *Easterwood*, the widow of a truck driver killed in a railroad crossing collision brought a state-law wrongful-death claim against the railroad. The United States Supreme Court held that FRSA's preemption clause barred the lawsuit to the extent it was based on an allegation that the railroad's train was traveling at an excessive speed. (*Easterwood*, *supra*, 507 U.S. at p. 661.) The Supreme Court determined the widow could not maintain her excessive speed claim because the Secretary of Transportation had promulgated regulations under FRSA setting maximum train speeds for certain classes of railroad track, thereby covering the subject matter of train speed with respect to track conditions, and the train was traveling within that speed limit. (*Easterwood*, *supra*, 507 U.S. at pp. 673-675.)

*Easterwood*, however, did not answer the question of whether FRSA would affect a claim under FELA, and FRSA is silent on this issue. BNSF asserts that just as FRSA preempts state law negligence suits, it should preclude Fair's FELA negligence suit. There is a difference between preemption and preclusion: "In pre-emption cases, the question is whether state law is pre-empted by a federal statute, or in some instances, a federal agency action[,]" while a preclusion case "concerns the alleged preclusion of a cause of action under one federal statute by the provisions of another federal statute." (*POM Wonderful, supra,* 134 S.Ct. at p. 2236.) While preclusion analysis is not

7.

governed by the "complex categorization" applicable to preemption, the principles of preemption are "instructive insofar as they are designed to assess the interaction of laws that bear on the same subject." (*Ibid.*) Preclusion is a matter of statutory interpretation, which applies even when multiple federal statutes or a federal agency are involved. (*Ibid.*)

BNSF asserts Fair's lawsuit is barred by regulations contained under Part 213 of the Code of Federal Regulations, entitled "Track Safety Standards." Inspection of switches is covered in 49 Code of Federal Regulations section 213.235, which provides: "(a) Except as provided in paragraph (c) of this section, each switch, turnout, track crossing, and moveable bridge lift rail assembly or other transition device shall be inspected on foot at least monthly. [¶] (b) Each switch in Classes 3 through 5 track that is held in position only by the operating mechanism and one connecting rod shall be operated to all of its positions during one inspection in every 3 month period. [¶] (c) In the case of track that is used less than once a month, each switch, turnout, truck crossing, and moveable bridge lift rail assembly or other transition device shall be inspected on foot before it is used."[4] The regulations also cover the preparation and storage of inspection reports, and create civil and criminal penalties for violations of the regulations. (49 C.F.R. §§ 213.15 & Appen. B., 213.241.) Finally, the regulations delegate responsibility to the railroads to comply with the requirements of Part 213 and set minimum qualifications for track inspectors. (49 C.F.R. §§ 213.5, 213.7.)

BNSF asserts that these regulations, taken together, evidence FRA's intent to substantially subsume any negligent switch inspection claim. In support, BNSF cites a case which found FRSA preempted state law claims of negligent inspection of freight

---

[4] This regulation is contained in Part 213, Subpart F, of the Code of Federal Regulations, which is entitled "Inspection." "This subpart prescribes requirements for the frequency and manner of inspecting track to detect deviations from the standards prescribed in this part." (49 C.F.R. § 213.231.)

cars, *In re Derailment Cases* (8th Cir. 2005) 416 F.3d 787, 793-794, and another which found that the FRSA regulation at issue here precluded a railroad employee's FELA claim that inspections should have occurred more than once per month, but did not preclude a claim that the inspections were subpar, *Ferren v. Nat'l R.R. Passenger Corp.* (N.D. Ill. Dec. 12, 2001) 2001 WL 1607586 at pp. *4-5. BNSF argues that because Fair's negligence claim was rooted in BNSF's failure to inspect the switch more frequently than FRSA regulations require, it falls within the scope of the regulations and is therefore precluded.[5]

Courts have reached different conclusions regarding the preclusive effect of FRSA on FELA claims. The Seventh Circuit Court of Appeals has held that FRSA superseded a railroad conductor's FELA claim that he suffered post-traumatic stress disorder after the train collided with a truck stopped on the railroad tracks; the lawsuit alleged the railroad was negligent for allowing the train to travel at an unsafe speed and failing to install additional warning devices at the crossing. (*Waymire*, *supra*, 218 F.3d at pp. 774, 777.) Although the *Waymire* court recognized *Easterwood* involved a preemption, not a preclusion, analysis, it found the case instructive. (*Waymire*, *supra*, 218 F.3d at p. 776.) The court determined that, in order to be consistent with *Easterwood* and "to uphold FRSA's goal of uniformity," it must reach the same result as *Easterwood*, since it would "seem absurd to reach a contrary conclusion in this case" when trains in both cases were operated identically and the Supreme Court already found the conduct was not culpable negligence. (*Waymire*, *supra*, 218 F.3d at p. 776.) The *Waymire* court further explained: "To treat cases brought under federal law differently from cases brought under state law would defeat FRSA's goal of uniformity. It would deny recovery to the motorist struck

---

[5] BNSF recognizes that one of the negligence theories that Fair presented to the jury, i.e. that the switch might have been damaged by a run through, would not be precluded by FRSA regulations. BNSF, however, argues this claim should not impact our analysis because it was not supported by competent evidence.

9.

by the train, but not to the engineer operating the train. We do not believe that is the result envisioned by the statute or by the Supreme Court's decisions." (*Waymire*, *supra*, 218 F.3d at p. 777.)

The Fifth and Sixth Circuit Courts of Appeals have embraced the reasoning of *Waymire*. (*Lane v. R.A. Sims, Jr., Inc.* (5th Cir. 2001) 241 F.3d 439, 443 (*Lane*); *Nickels v. Grand Trunk W. R.R., Inc.* (6th Cir. 2009) 560 F.3d 426, 430 (*Nickels*).)[6] The court in *Lane* emphasized that FRSA regulations should preempt excessive speed claims under FELA based on the importance of uniform liability no matter the class of the plaintiffs in a case. (*Lane*, *supra*, 241 F.3d at p. 443.) The *Lane* court explained: "Such uniformity can be achieved only if the regulations covering train speed are applied similarly to a FELA plaintiff's negligence claim and a non-railroad-employee plaintiff's state law negligence claim. Otherwise, a railroad employee could assert a FELA excessive-speed claim, but a non-employee motorist involved in the same collision would be precluded from doing so. Dissimilar treatment of the claims would have the untenable result of making the railroad safety regulations established under the FRSA virtually meaningless: 'The railroad could at one time be in compliance with federal railroad safety standards with respect to certain classes of plaintiffs yet be found negligent under the FELA with respect to other classes of plaintiffs for the very same conduct.'" (*Lane*, *supra*, 241 F.3d at p. 443.) In *Nickels*, relying heavily on *Waymire* and *Lane*, the Sixth Circuit reached the same conclusion for similar reasons with respect to the preclusion of FELA claims by a FRSA regulation governing ballast composition. (*Nickels*, *supra*, 560 F.3d at p. 430.)

---

[6] See also *MD Mall Associates, LLC v. CSX Transp., Inc.* (3d Cir. 2013) 715 F.3d 479, 491, fn. 10 [citing *Nickels* and *Lane*, the court noted there is a "general consensus" that uniformity can be achieved only if FRSA regulations are applied similarly to FELA and state law claims, consequently "courts apply the principles distilled by *Easterwood* and its progeny in determining whether a claim under FELA is substantially subsumed, and therefore precluded, by railroad safety regulations enacted pursuant to the FRSA."].)

In the only published California state court case to address this issue, *Southern California Regional Rail Authority v. Superior Court* (2008) 163 Cal.App.4th 712, 739 (*Southern California*), the Second District Court of Appeal followed *Waymire* in concluding that since FRSA regulations relating to operation of a train in "push mode" preempted state law wrongful death and personal injury claims of passengers and their survivors, it also precluded FELA claims by the railroad workers. The court explained: "[T]he principles that support preemption as to the passenger plaintiffs apply with the same force to the claims of the railroad worker plaintiffs. [Citation.] Consequently, the railroad worker plaintiffs push mode claims brought under the FELA are indistinguishable from those of the passenger plaintiffs brought under state negligence law." (*Southern California*, *supra*, 163 Cal.App.4th at p. 739.)

Although the Ninth Circuit Court of Appeals has not addressed this issue, some federal district courts within the circuit have applied the reasoning in *Nickels* and *Easterwood* when determining whether FRSA precludes a FELA claim. (*Allenbaugh v. BNSF Ry. Co.* (E.D. Wash. 2011) 832 F.Supp.2d 1260, 1266 ["If a cause of action would be preempted by the FRSA if brought under state law, the cause is likewise precluded by the FRSA if it is brought under the FELA."]; *Abromeit v. Montana Rail Link, Inc.* (D. Mont. Sept. 15, 2010) 2010 WL 3724425 at *4 & fn.2 [noting that while preemption analysis only applies to conflicts between state and federal law, courts have concluded FELA claims may be precluded under a similar analysis based on FRSA's policy of ensuring uniformity in railway safety]; see also *Parise v. Union Pacific R.R.* (E.D. Cal. May 14, 2014) 2014 WL 2002281 at *7 [holding that analogous federal Locomotive Inspection Act precluded FELA claim].)

Other courts, however, have declined to apply *Easterwood's* reasoning to preclusion claims. In *Earwood v. Norfolk Southern Ry. Co.* (N.D. Ga. 1993) 845 F.Supp. 880 (*Earwood*), the district court concluded that FRSA did not preclude a railroad employee's excessive speed claim under FELA because "[t]he two statutes do not purport

11.

to cover the same areas" and FRSA does not purport to define the standard of care with which railroads must act with regard to employees. (*Id.* at p. 885.) Noting that unless there is "an intolerable or irreconcilable conflict between two statutes, a court need not decide whether one controls over the other," the district court found there was no "'intolerable conflict'" between FRSA and FELA. (*Ibid.*) Since under a preclusion analysis a court must examine the purpose underlying the regulation, the district court concluded it was not contrary to the evident statutory purpose of FRSA regulations to allow a FELA claim based on unsafe speed, since the regulations were not directed at the issue of employee safety. (*Id.* at p. 891.)[7]

In the case the trial court relied on in denying BNSF's in limine motion, *Powell*, *supra*, 2013 WL 1857893, the district court found that FRSA did not preclude the plaintiff's FELA claim based on the railroad's failure to inspect its railroad switches in general, or the particular switch at issue in the case. The district court declined to follow *Waymire*, noting that *Easterwood* did not address whether: (1) the preemptive effect of FRSA would apply to claims of negligence under FELA; or (2) the switch inspection regulations substantially subsume the subject matter such that they are incompatible with FELA claims based on frequency of inspection. (*Powell*, *supra*, 2013 WL 1857893 at p. *1.) Noting that FRSA preemption effectuates the primacy of federal laws by limiting state law negligence claims that could result in inconsistent regulation of railroad safety, the district court found this goal did not seem to justify FRSA preclusion of FELA claims because the standard of care is one of federal law that applies across the nation. (*Powell*, *supra*, 2013 WL 1857893 at p. *2.) The district court reasoned that finding preclusion between the two statutes would be tantamount to concluding Congress intended FRSA to

---

[7] The courts in *Waymire* and *Lane* both declined to follow the decision in *Earwood*. (*Waymire*, *supra*, 218 F.3d at p. 776; *Lane*, *supra*, 241 F.3d at p. 443.)

12.

reconfigure the basic structure for imposing liability under FELA from one of negligence to only statutory violations in certain instances. (*Powell*, *supra*, at p. *2.)**8**

In *Cowden v. BNSF Ry. Co.* (8th Cir. 2012) 690 F.3d 884, 892 (*Cowden*), the Eighth Circuit Court of Appeals criticized the reasoning of *Waymire* and its progeny. The court, however, declined to create a circuit split, as the issue was not properly raised in the district court and even if FRSA's express preemption clause could be applied to preclude federal laws, it was not properly applied in that case. (*Cowden*, *supra*, 690 F.3d at p. 892.)

More recently, federal and state courts have declined to follow *Waymire*, *Lane* and *Nickels*, and instead have held that FRSA and its regulations do not preclude FELA claims, relying, in part, on the United States Supreme Court's June 2014 decision in *POM Wonderful*, *supra*, 134 S.Ct. 2228. (See *Henderson v. Nat'l Railroad Passenger Corp.* (S.D.N.Y. Feb. 19, 2015) ___ F.Supp.3d ___, 2015 WL 728094 at pp. *3-8 (*Henderson*); *Hananburgh v. Metro-North Commuter Railroad* (S.D.N.Y. Mar. 18, 2015) 2015 WL 1267145 at pp. *2-4; *Bratton v. Kansas City Southern Railway Co.* (W.D. La. Feb. 24, 2015) 2015 WL 789127; *Noice v. BNSF Railway Co.* (N.M. Ct.App. 2015) 348 P.3d 1043, 1046-1049, cert. granted May 11, 2015 (*Noice*).)

Based on the reasoning in these recent decisions, we respectfully disagree with the decisions in *Waymire*, *Lane*, and *Nickels*, as we find the reasoning in *Henderson* and the more recent decisions more persuasive. Accordingly, we conclude that FRSA does not preclude Fair's FELA claim.

---

**8** The district court also found that even if FRSA regulations sometimes preclude FELA claims, it was not satisfied that the regulation at issue, 49 Code of Federal Regulations section 213.235, had a preclusive effect because the concern behind the regulation was not to protect employees from injuries while pulling the switch, but rather to prevent derailments and other catastrophes resulting from improperly aligned or defective switches. (*Powell*, *supra*, at *3.)

As pointed out by the New Mexico Court of Appeals in *Noice*, "'[w]hen two federal statutes address the same subject in different ways, the right question is whether one implicitly repeals the other [through an] irreconcilable conflict between the statutes or a clearly expressed legislative decision that one replace the other.' *Randolph* [*v. IMBS, Inc.* (7th Cir. 2004)] 358 F.3d [726,] 730. When two federal statutes may be interpreted harmoniously, 'a court must interpret them in a manner which gives . . . operation and effect to both, in the absence of clear and unambiguous expression of Congressional intent to the contrary.' *United States v. Kenaan*, 557 F.2d 912, 917 (1st Cir. 1977). Thus, 'repeal by implication is a rare bird indeed.' *Randolph*, 368 F.3d at 730." (*Noice*, *supra*, 348 P.3d at pp. 1047-1048.)

The *Noice* court concluded that because there is no "clear and unambiguous" indication in FRSA that Congress intended to eliminate workers' remedies under FELA, courts are obligated to construe FRSA in a way that harmonizes it with FELA. (*Noice*, *supra*, 348 P.3d at p. 1048; see also *Henderson*, *supra*, 2015 WL 728094 at p. *5 ["In enacting the FRSA, Congress did not clearly express an intent to preclude FELA claims."].) The *Noice* court noted the *Earwood* court met this obligation when it concluded FELA and FRSA had different purposes, while the *Waymire* line of cases effectively held that FRSA and its regulations impliedly repealed FELA without addressing the effect of repeal on railroad workers. (*Noice*, *supra*, 348 P.3d at p. 1048.) As the district court explained in *Henderson*: "To the contrary, the purpose of the FRSA – 'to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents,' 49 U.S.C. § 20101 – is entirely consistent with FELA's goal of promoting the safety of railroad employees by facilitating their ability to recover for injuries caused by a railroad's negligence." (*Henderson*, *supra*, 2015 WL 728094 at p. *5.) The *Henderson* court declined to rewrite FRSA's express statutory language by inferring its regulations preclude covered federal claims under FELA as well as covered state law claims. (*Ibid.*)

14.

Moreover, while the *Waymire* line of cases was concerned with uniformity, FRSA's "vague directive" that "'[l]aws, regulations, and orders related to railroad safety . . . shall be nationally uniform to the extent practicable[,]'" must be read in the context of the section in which it appears, which exclusively addresses the preemption of state law. (*Henderson*, *supra*, 2015 WL 728094 at p. *6.) In contrast, FELA imposes a nationally uniform standard for determining whether a railroad should be held liable for injuries sustained by its employees. (*Ibid.*; see *Urie v. Thompson* (1949) 337 U.S. 163, 174 (*Urie*) ["[w]hat constitutes negligence for [FELA's] purposes is a federal question, not varying in accordance with the differing conceptions of negligence applicable under state and local laws for other purposes."].)

Allowing safety-related suits under FELA will enhance FRSA's stated purpose of promoting railroad safety and reducing accidents. (49 U.S.C. § 20101.) It is true that, if FRSA preempts covered state laws only, inconsistent recoveries may result for railroad employees under FELA and other plaintiffs bringing state law claims. That risk, however, is not unique, as the relaxed causation standard under FELA already presents a possibility that in any given case, railroad employees may be able to recover under FELA while a plaintiff's state-law claim based on the same negligent conduct fails.

The *Henderson* and *Noice* courts found instructive the United States Supreme Court's decision in *POM Wonderful*, *supra*, 134 S.Ct. 2228, which addressed the interplay between federal statutes. (*Henderson*, *supra*, 2015 WL 728094 at p. *9; *Noice*, *supra*, 348 P.3d at p. 1048.) In *POM Wonderful*, the question was whether a suit under the Lanham Act (15 U.S.C. § 1125) alleging that Coca-Cola, the plaintiff's business competitor, used a deceptive and misleading label on Coca-Cola's product, was precluded by the Federal Food, Drug and Cosmetic Act (FDCA) (12 U.S.C. §§ 331, 343), that forbids the misbranding of food, including by false and misleading labeling, and places enforcement of misbranding of food and drink in the hands of the Food and Drug Administration (FDA). (*POM Wonderful*, *supra*, 134 S.Ct. at p. 2233.) The Ninth

15.

Circuit Court of Appeals held the FDCA precluded the Lanham Act claim, reasoning that Congress decided to entrust matters of juice beverage labeling to the FDA, which promulgated comprehensive labeling regulations that did not impose the requirements the plaintiff sought to impose on Coca-Cola. (*POM Wonderful*, *supra*, 134 S.Ct. at p. 2236.) The Ninth Circuit did not believe it should act where the FDA had not, as to do so would risk undercutting the FDA's expert judgment and authority. (*Ibid.*)

The Supreme Court reversed, finding preclusion did not apply, as: (1) there was no statutory text or established interpretive principle to support preclusion, (2) nothing relating to either statute showed a congressional purpose or design to forbid such suits, and (3) to the contrary, the statutes complemented each other in the federal regulation of misleading food and beverage labels. (*POM Wonderful*, *supra*, 134 S.Ct. at p. 2233.)

The Court first explained that neither statute contained a provision that disclosed a purpose to bar unfair competition claims like that asserted by the plaintiff. (*POM Wonderful*, *supra*, 134 S.Ct. at p. 2237.) The Court found this absence of "special significance" because the two statutes had coexisted for 70 years, and if Congress had concluded that Lanham Act suits could interfere with the FDCA, it might have enacted a provision addressing the issue. (*Ibid*.) The Court noted that while Congress had enacted amendments to the FDCA and Lanham Act, including an amendment that added an express preemption provision with respect to state laws addressing food and beverage misbranding, it did not enact a provision addressing the preclusion of other federal laws in this area; in the Court's view, this constituted "'powerful evidence that Congress did not intend FDA oversight to be the exclusive means' of ensuring proper food and beverage labeling." (*Ibid*.) The Court further found that the complex preemption provision added to the FDCA in 1990, which was the closest the statutes had come to addressing the preclusion of the plaintiff's Lanham Act claim, suggested that Lanham Act suits are not precluded. (*Id.* at pp. 2237-2238.)

In finding the statutes complemented each other, the Court explained that the statutes have their own scope and purpose; while both touch on food and beverage labeling, the Lanham Act protects commercial interests against unfair competition, while the FDA protects public health and safety. (*POM Wonderful*, *supra*, 134 S.Ct. at p. 2238 ["When two statutes complement each other, it would show disregard for the congressional design to hold that Congress nonetheless intended one federal statute to preclude the operation of the other."].) The Court further explained that even when the Lanham Act touches on the same subject matter as the FDA, Lanham Act suits provide incentives for manufacturers to behave well and allowing such suits "takes advantage of synergies among multiple methods of regulation." (*Id.* at pp. 2238-2239.) The Court noted this "was consistent with the congressional design to enact two different statutes, each with its own mechanisms to enhance the protection of competitors and consumers." (*Id.* at p. 2239.)

In reaching these conclusions, the Court rejected Coca-Cola's argument that preclusion applied because Congress intended national uniformity in food and beverage labeling: "Although the application of a federal statute such as the Lanham Act by judges and juries in courts throughout the country may give rise to some variation in outcome, this is the means Congress chose to enforce a national policy to ensure fair competition. It is quite different from the disuniformity that would arise from the multitude of state laws, state regulations, state administrative agency rulings, and state-court decisions that are partially forbidden by the FDCA's pre-emption provision. Congress not infrequently permits a certain amount of variability by authorizing a federal cause of action even in areas of law where national uniformity is important." (*POM Wonderful*, *supra*, 134 S.Ct. at pp. 2239-2240.)

The Court also rejected the Government's argument that Lanham Act claims were precluded "'to the extent the FDCA or FDA regulations specifically require or authorize the challenged aspects of [the] label.'" (*POM Wonderful*, *supra*, 134 S.Ct. at p. 2240.)

17.

The Court found the Government's position flawed – instead of the FDCA and its regulations being a ceiling on the regulation of food and beverage labeling, Congress intended the two statutes to complement each other with respect to such labeling. (*Ibid*.) The Court explained: "The Government asks the Court to preclude private parties from availing themselves of a well-established federal remedy because an agency enacted regulations that touch on similar subject matter but do not purport to displace that remedy or even implement the statute that is its source. Even if agency regulations with the force of law that purport to bar other legal remedies may do so, it is a bridge too far to accept an agency's after-the-fact statement to justify that result here. An agency may not reorder federal statutory rights without congressional authorization." (*Id.* at p. 2241, citations omitted.)

We agree with the *Henderson* court that, while *POM Wonderful* does not involve FRSA or FELA, its reasoning is "highly instructive in interpreting the relationship between" those statutes. (*Henderson*, *supra*, 2015 WL 728094 at p. *9.) As the *Henderson* court explained: "Like the FDCA, the FRSA authorizes an agency to promulgate specific regulations in furtherance of the statute's purpose and provides that those regulations preempt certain state laws in the interest of national uniformity. Like the Lanham Act, the FELA provides a broad private right of action under federal law that purportedly undermines such uniformity. And like the relationship between the Lanham Act and the FDCA, the FELA and the FRSA complement each other in significant respects, in that each statute is designed to accomplish the same goal of enhancing railroad safety through different means. Under these circumstances, *POM Wonderful* clearly dictates that the FRSA should not be interpreted to preclude federal claims under the FELA, in accordance with the plain meaning of its text." (*Henderson*, *supra*, 2015 WL 728094 at p. *9.)[9] The *Henderson* court noted that the objective of achieving

---

[9] Admittedly, there is a somewhat greater overlap between the scope and purpose of FRSA and FELA than the statutes in *POM Wonderful*, as both are directed toward

18.

national uniformity is explicitly stated in FRSA, while that objective is implied in the FDCA, but thought this was a minor distinction that did not warrant a different result, as nothing in *POM Wonderful* suggested its reasoning hinged on Congress's failure to make explicit the FDCA's implicit objective of achieving nationally uniform laws related to food and drink labeling. (*Henderson*, *supra*, 2015 WL 728094 at p. *9.)

BNSF argues we should not follow these recent decisions because they do not give due deference to the *Waymire* line of cases, as they do not explain how *POM Wonderful* changed the preclusion analysis or why *Waymire* should not be afforded any deference in light of these changes. But the cases do explain why *Waymire* should not be followed – because to do so would be to rewrite FRSA's express statutory language by inferring that its regulations preclude covered FELA claims as well as covered state law claims (*Henderson*, *supra*, 2015 WL 728094 at p. *5; *Noice*, *supra*, 348 P.3d at p. 1048.)

To the extent BNSF is contending that we are required to defer to the *Waymire* line of cases, we disagree. "'[D]ecisions of the lower federal courts, although entitled to great weight, are not binding on state courts. "[T]he decisions of the lower federal courts on federal questions are merely persuasive.... Where lower federal court precedents are divided or lacking, state courts must necessarily make an independent determination of federal law." (*Rohr Aircraft Corp. v. San Diego* (1959) 51 [Cal.]2d 759, 764.)' (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 506, pp. 569–570.)" (*In re Marriage of Padgett* (2009) 172 Cal.App.4th 830, 839 [split in federal authority on effect of

railroad safety. But they accomplish this goal through different means: FRSA seeks to enhance safety in "every area of railroad operations[,]" and protects the public as well as railroad workers through national, comprehensive regulatory standards (49 U.S.C. § 20101), while FELA focuses solely on the safety of railroad workers through the common law of negligence, rather than prohibiting or requiring specific conduct. Similar to the statutes in *POM Wonderful*, allowing FELA suits "takes advantage of synergies among multiple methods of regulation" and is "consistent with the congressional design to enact two different statutes, each with its own mechanisms to enhance" railroad safety. (*POM Wonderful*, *supra*, 134 S.Ct. at p. 2239.)

Qualified Domestic Relations Order under Employee Retirement Income Security Act required state court to make independent evaluation].)[10]

BNSF contends the broad, unlimited language of FRSA's preemption provision is properly read to support both preemption of covered state law claims and preclusion of FELA negligence claims. BNSF asserts this conclusion is strengthened by Congress's 2007 decision to reenact verbatim section 20106(a)(1)'s preemption provision after numerous courts interpreted its language to preclude FELA claims.[11] BNSF argues,

---

[10] We note that in *Keiper v. Northwestern Pac. R. Co.* (1955) 134 Cal.App.2d 702, the Third District Court of Appeal declined to resolve a conflict in federal law in a FELA case, stating as a general proposition that "[a]ll questions of substance presented in actions under this statute are federal questions upon which the decisions of the federal courts are conclusive and binding upon all state courts." (*Keiper, supra*, 134 Cal.App.2d at pp. 706-707.) The federal cases *Keiper* cited for this principle, however, do not support the proposition that federal decisions are binding on us, but instead state merely: FELA was not intended to govern the rules of evidence (*Atlantic Coast Line R. Co. v. Dixon* (5th Cir. 1953) 207 F.2d 899, 903); substantive issues under FELA are federal questions to be determined by federal rather than state law (*Dice v. Akron, C. & Y. R. Co.* (1952) 342 U.S. 359, 361); the rights created under FELA "are federal rights protected by federal rather than local rules of law" (*Bailey v. Central Vermont Ry. Co.* (1943) 319 U.S. 350, 352); and both the Jones Act and FELA, which is incorporated by reference into the Jones Act, require uniform interpretation throughout the country, and a state court trying a maritime case is bound to proceed so to protect the substantial rights of the parties under controlling federal law (*Garrett v. Moore-McCormack Co.* (1942) 317 U.S. 239, 244). We adhere, instead, to "the prevailing view" that we are empowered to make an independent determination of federal law where lower federal court precedents are divided. (9 Witkin, Cal. Proc. (5th ed. 2008) Appeal, § 506, pp. 569-570.)

[11] Prior to 2007, former section 20106 read as follows: "§ 20106. National uniformity of regulation. [¶] Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order – [¶] (1) is necessary to eliminate or reduce an essentially local safety hazard; [¶] (2) is not incompatible with a law, regulation, or order of the United States

citing *Lorillard v. Pons* (1978) 434 U.S. 575, 580 (*Lorillard*), that by reenacting section 20106(a)(1) verbatim, Congress intended to adopt the judicial interpretation that this provision both preempts covered state law claims and precludes covered FELA claims, because "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."

The 2007 amendment added subsection (b) to section 20106, to clarify that nothing in FRSA "shall be construed to preempt an action under State law seeking damages for personal injury, death or property damage," where certain enumerated allegations are made. (*Grade v. BNSF Ry. Co.* (8th Cir. 2012) 676 F.3d 680, 684-685 (*Grade*); § 20106(b).) The subsection was added in response to a group of cases arising out of a 2006 train derailment in North Dakota which released hundreds of gallons of toxic gas into the air, injuring many people, in which federal courts found FRSA completely preempted the plaintiffs' state causes of action. (*Grade*, *supra*, 676 F.3d at pp. 684-685.) As the court in *Grade* explained, the legislative history of the 2007 amendment indicates it was intended to clarify the preemptive effect of FRSA, not to change it. (*Grade*, *supra*, 676 F.3d at pp. 685-686.)

While in enacting section 20106, subdivision (b) Congress re-enacted the preemption provision of subdivision (a) verbatim, BNSF does not point to anything in the legislative history to show that Congress was aware of the judicial interpretations of subdivision (a). "The reenactment doctrine . . . tends to be applied when there is reason, either based on the nature of the regulatory interpretations or the context of the reenactment, to presume that Congress was aware of the interpretation that it was supposedly adopting." (*Fortis, Inc. v. U.S.* (S.D.N.Y. 2004) 420 F.Supp.2d 166, 179-180 [explaining that in *Lorillard*, the Supreme Court "specifically noted that the judicial

Government; and [¶] (3) does not unreasonably burden interstate commerce." The 2007 amendment reenacted the first sentence verbatim as subdivision (a)(1). (§ 20106(a)(1).)

21.

interpretations underlying the issue were 'well established' and that 'Congress exhibited both a detailed knowledge of the [relevant] provisions and their judicial interpretation'"].)**[12]**

When Congress enacted FRSA in 1970, FELA had been in existence for more than 60 years. (See FRSA, Pub.L. No. 91-458 (Oct. 16, 1970) 84 Stat. 971; FELA, 60 Cong., ch. 149 (Apr. 22, 1908) 35 Stat. 65.) Given that history, the absence of any provision in FRSA addressing its effect on FELA is significant. If Congress had concluded that FELA suits would interfere with the operation of FRSA, it could have enacted a provision addressing the issue during these statutes' 45 years of co-existence. (*POM Wonderful*, *supra*, 134 S.Ct. at p. 2237.) In light of FRSA's failure to mention its effect on FELA, Congress could not have intended preclusion of FELA claims when that would harm FELA's purpose of promoting the safety of railroad workers by (1) leaving injured workers with no recourse against their employer when their claim is based on conduct they allege was negligent but which complies with FRSA and its regulations, and (2) insulating broad categories of potentially negligent conduct from any accountability.

In sum, in accordance with the Supreme Court's caution that FELA should not be "'cut down by inference or implication[,]'" (*Cowden*, *supra*, 690 F.3d at 892, quoting *Urie, supra,* 337 U.S. at p. 186), its observation that Congress sometimes "permits a certain amount of variability by authorizing a federal cause of action even in areas of law where national uniformity is important," and that "[p]re-emption of some state requirements does not suggest an intent to preclude federal claims" (*POM Wonderful*, *supra*, 134 S.Ct. at pp. 2238-2240), we conclude that FRSA and its regulations do not

---

**[12]** The legislative history of the 2007 amendment shows that Congress intended the entire section to address the preemption of state laws related to railroad safety and security by changing section 20106's title from "National Uniformity of Regulation" to "Preemption"; while subdivision (a) was restructured for clarification purposes, the restructuring was not intended to indicate any substantive change in the meaning of the provision. (H.R. Conf. Rep. No. 110-259, p. 351 (2007).)

preclude any aspect of Fair's FELA claim. (*Henderson*, *supra*, 2015 WL 728094 at p. *10.)

III. Causation

At the close of Fair's case, BNSF moved for a directed verdict.[13] One of the grounds for the motion was that Fair did not present any evidence that BNSF's negligence caused Fair's back injury. The trial court denied the motion. After both parties rested, BNSF renewed its motion for directed verdict, which the trial court again denied. On appeal, BNSF argues the trial court erred in denying the motions because Fair "wholly failed to offer probative causation evidence showing that his throwing of the 5176 switch caused his injuries." BNSF asserts this is because Fair's medical causation expert, Dr. Jerry Smith, "based his entire testimony on a flatly incorrect and unsupported understanding of the mechanics of Mr. Fair's alleged injury-producing event[,]" and BNSF's biomechanist conclusively established that it was physically impossible for Fair's injuries to be caused in the manner that either Fair or Dr. Smith described.

A. Standard of Review

We review the trial court's denial of a directed verdict under the substantial evidence standard. When the party who unsuccessfully moved for a directed verdict ultimately suffers an adverse jury verdict, the "assertion that he was 'unfairly denied a directed verdict' is . . . functionally equivalent to contending there was insufficient evidence to support the jury verdict against him. Only if there was *no* substantial evidence in support of the verdict could it have been error for the trial court earlier to have denied [the] motion for directed verdict." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630 (*Howard*).)

---

[13] Although BNSF called the motion a "directed verdict," that motion is properly brought after all parties have completed their evidence unless the trial court specifies an earlier time for the motion. (Code Civ. Proc., § 630, subd. (a).)

23.

Under this standard of review, "we must consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the judgment." (*Howard*, *supra*, 72 Cal.App.4th at p. 630.) "It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact. Our authority begins and ends with a determination as to whether, on the entire record, there is *any* substantial evidence, contradicted or uncontradicted, in support of the judgment. . . . We must accept as true all evidence and all reasonable inferences from the evidence tending to establish the correctness of the trial court's findings and decision, resolving every conflict in favor of the judgment." (*Id.* at pp. 630-631.) If substantial evidence is present, "no matter how slight it may appear in comparison with the contradictory evidence, the judgment must be upheld. As a general rule, therefore, we will look only at evidence and reasonable inferences supporting the successful party, and disregard the contrary showing." (*Id.* at p. 631.) Even if the judgment is against the weight of the evidence, we are bound to uphold it so long as the record is free from prejudicial error and it is supported by evidence of """"ponderable legal significance,"""" """"reasonable in nature, credible, and of solid value. . . ."""" (*Ibid.*)

B. Trial Testimony

Here, Fair's treating physician for his back injury, Jerry N. Smith, M.D., a physical medicine rehabilitation doctor who specializes in the spine, testified about Fair's injury and its cause. Smith understood that when Fair was injured, he was moving a switch from left to right when the switch apparently stuck; at that point, Fair repositioned himself, pushed down hard on the switch, and felt a pop in his back, which was when the pain began. When Fair felt the pop, he tore the annulus, which is the outside dense fibrous tissue that holds in the core of the disk or its nucleus, and herniated part of that disk in the lower back, at the L5/S1 disk space. Fair also may have caused a small crack

in the S1 end plate, as indicated on the MRI by a slight dip in the superior end plate of S1 on the left side.

Based on his review of the two MRIs that were taken of Fair's back, one performed the week after the accident and the other in March 2012, and his treatment of Fair, Smith opined that, to a reasonable degree of medical probability, the pop was caused when Fair flexed forward and met unexpected forces, thereby causing a traumatic injury to his disk. Smith further opined that if Fair was pushing on the switch towards his right, he would stretch the annulus more on the left side, causing a pulling away of fibers on either the top or bottom. Smith explained that studies by Stuart McGill, who has done work recreating spine models in the laboratory, found when one goes to the right side, a lot of pressure is put on the left side of the disk, and McGill has been able to recreate a herniation to the opposite side. With some twist, the risk of tearing the disk increases. Smith also opined, based on the MRI findings and the history and pain diagram Fair gave Smith, that injuries to his low back affected the nerves running down his left leg and caused stabbing pain in his low back area. Smith believed the accident caused Fair's back problems.

On cross-examination, defense counsel asked Smith to physically demonstrate his understanding of how Fair threw the switch, with defense counsel narrating Smith's movements. Smith understood that the switch was on the ground and Fair picked it up by either kneeling, squatting, or bending directly over it. Fair grabbed the wide handle with both hands, picked it up, and moved it to the right. Smith did not know to what angle the switch went, but believed it went to an angle and stopped. Smith then understood that Fair repositioned himself by getting "his bearings a little bit because it stuck and he was going to push harder," and he pushed down on it. Defense counsel stated Smith had shown the jury that Fair was bent at the waist when he pushed down and asked Smith if that was his understanding; Smith responded that Fair "likely did, he would have to

25.

through the spine as well." Smith did not know if Fair moved his feet when he repositioned himself.

C. Analysis

BNSF argues Smith's testimony cannot constitute substantial evidence of causation because it does not reflect the events that Fair described. In so arguing, BNSF cites the principle that when an expert's opinion is premised upon facts contradicted by the only evidence of record, the expert's opinion does not constitute substantial evidence in support of the judgment. (*Estate of Powers* (1947) 81 Cal.App.2d 480, 485–486; see *Hyatt v. Sierra Boat Co.* (1978) 79 Cal.App.3d 325, 338-339; *White v. State of California* (1971) 21 Cal.App.3d 738, 759–760.)

The handle on the switch that Fair threw was 45 degrees from the ground and was ergonomically designed, which put the user in a better position to be able to move the load; the user did not need to bend down as far as was required with an old style handle. According to Fair, when he threw the switch, he was facing the switch and the railroad tracks. He would have stepped on the pedal to release the handle from the lock, grabbed the handle, which was in the left position, and lifted the switch up and slid it over to the right. The switch stopped before Fair could get it into the keeper on the right side, so Fair "repositioned over the switch and attempted to press it down into the locking mechanism." When he repositioned, he was still pushing at an angle, so he was "kind of turned into it." Fair then felt an instant pain in his back and heard and felt "like a pop" at the same time; instantly pain shot down his leg and up his back.

BNSF asserts we must disregard Smith's testimony as to causation because his assumption of how Fair threw the switch is contradicted by Fair's testimony. We disagree. BNSF correctly points out that Smith did not understand that the switch handle was not on the ground, but rather was 45 degrees from the ground, but Smith did not testify, as BNSF asserts, that Fair was injured while bending to the ground. Instead, Smith testified that Fair was injured *after* Fair picked up the switch handle off the ground,

26.

when he tried to move the switch to the right, repositioned himself over the switch, and pushed down hard on it. Smith testified it was when Fair flexed forward and met unexpected forces that he injured his disk. This testimony is entirely consistent with Fair's testimony and is supported by the record.

BNSF also contends Smith's testimony does not constitute evidence of causation because he did not know the angle of the switch when Fair was injured. Smith's opinion, however, was not based on the angle of the switch, but instead was based on the assumption that Fair pushed the switch to his right. Smith opined that if Fair was pushing the switch to his right, especially with some twist, he would stretch the annulus more on the left side and was at increased risk of herniating or tearing the disk on his left side. This opinion, coupled with Fair's testimony that he felt the pop in his back after he repositioned over the switch, so he was still pushing the switch at an angle but was turned into the switch, is sufficient evidence that Fair's manipulation of the switch caused Fair's back injuries.

BNSF asserts that Smith's and Fair's testimony cannot overcome "the conclusive testimony" from its biomechanist, Sean Shimada, who opined that pushing down on the switch would not cause an acute disk herniation or disruption, as such an injury typically is caused by picking up an object, thereby compressing the spine. Shimada's opinion, however, was far from conclusive, as he testified on cross-examination that in rendering his opinion, he assumed Fair was square to the switch when he operated it and did not twist or bend significantly in doing so. Shimada agreed that this would affect the values and analysis to some degree; although he explained it would only change the force measurements, not the mechanism, he agreed with Smith that in meeting resistance while pushing something to the right, the contralateral side of the back can be affected. Moreover, since we have concluded that Smith's testimony provides substantial evidence supporting the jury's verdict, we do not consider the weight that should be ascribed to the testimony of BNSF's expert witness. (See, e.g., *Mardirossian & Associates, Inc. v.*

27.

*Ersoff* (2007) 153 Cal.App.4th 257, 273 [defendant's contention that the conclusions of the plaintiff's expert were unbelievable when compared to the defense expert's testimony related to the credibility of the plaintiff's expert and the appropriate weight to be given his opinion, which are "matters properly resolved by a jury, not an appellate court."].)

In sum, substantial evidence supports the jury's finding of causation.

IV. Subsequent Remedial Measures

BNSF next contends the trial court abused its discretion by allowing Fair to use evidence of subsequent remedial measures as evidence of negligence. Specifically, BNSF challenges the admission into evidence of (1) two photos of BNSF employees around the switch shortly after the accident, which were taken by Fair's wife;[14] and (2) a report entitled "Report of Inspection" prepared by BNSF employee Mark Johnson after the inspection of the switch.[15] BNSF also objects to references to this evidence, or to the inspection itself, in arguments or questions by Fair's counsel.

A. Evidence Code section 1151 and the Standard of Review

Evidence Code section 1151 provides: "When, after the occurrence of an event, remedial or precautionary measures are taken, which, if taken previously, would have tended to make the event less likely to occur, evidence of such subsequent measures is

---

[14] One photograph shows four employees standing around the switch, with three looking down at the switch and a fourth apparently standing on the handle. The other photograph shows two employees looking down at the switch and a third employee leaning on the handle.

[15] The inspection report is signed by track supervisor Johnson and states that he inspected the switch at "0530" on the date of the accident due to an injury. The following is handwritten under the heading "List all other parts or equipment inspected and state condition of each": "Switch stand handle was torqued with a torque wrench. Push Down [-] Left 100[,] Middle 30/20[,] Right 130[;] Lift Up [-] Left 50[,] Middle 25/25[,] Right 80[.]" The following is handwritten under the heading "What repairs were made to equipment: (List all repairs to each piece of equipment)": "Adjust rod, adjust eyelet and roller. Lubed and cleaned switch[.] Torque readings are. Push Down[-] Left 85[,] Middle 72/40[,] Right 80[;] Lift Up[-] Left 60[,] Middle 74/44[,] Right 85[.]"

inadmissible to prove negligence or culpable conduct in connection with the event." Our Supreme Court has explained that Evidence Code section 1151 refers to "'remedial or precautionary measures,'" not to reports or investigations conducted after an injury-producing event, and "appear[s] to include only *subsequent actions taken to repair or correct* a problem identified by an investigation – not the factual inquiries undertaken to determine whether such repair or correction was necessary." (*Fox v. Kramer* (2000) 22 Cal.4th 531, 544 (*Fox*).) Moreover, while Evidence Code section 1151 refers to measures "which, *if taken previously*, would have tended to make the event less likely to occur," "reports of investigations relating to an incident could not have been made *prior thereto*." (*Fox*, *supra*, 22 Cal.4th at p. 544.)

We review the trial court's rulings as to admissibility of evidence for abuse of discretion. (*People ex rel. Lockyer v. Sun Pacific Farming Co.* (2000) 77 Cal.App.4th 619, 639.) "The trial court's 'discretion is only abused where there is a clear showing [it] exceeded the bounds of reason, all of the circumstances being considered.'" (*Id.* at p. 640.)

B. Trial Proceedings

At trial, BNSF brought a motion in limine to exclude the photos and inspection report on the ground they were inadmissible evidence of subsequent remedial measures under Evidence Code section 1151. Defense counsel argued that the 200 pictures that Fair's wife took, as well as the inspection report, had no probative value other than to support the claim the switch was fixed because it was defective. Defense counsel recognized that BNSF's employees had conducted an investigation, but asserted that the investigation could not be separated from the repairs, and therefore all of the evidence was inadmissible as subsequent remedial measures. Fair's counsel responded that the only way to prove that the bent connecting rod caused the switch to be out of compliance was through the subsequent inspection and work performed, which the photos would help show. Fair's counsel asked the trial court to consider the photos on a case-by-case basis,

as some showed the employees engaging in actions that were not repairs but indicated the switch was not functioning properly, while others showed the employees holding tools and working on the switch. The trial court denied the motion, but stated it would look at each photo Fair's counsel intended to offer to determine whether it was evidence of either a repair, an inspection, or a report after the incident.[16]

Later, before any of these photographs were used at trial, the trial court explained, outside the jury's presence, that it was going to allow Fair's counsel to introduce, through the testimony of Fair's railroad engineering consultant Raymond A. Duffany, two photographs from which Duffany could state there are "folks out there" who appear to be near the switch, and one who appears to be standing on the switch. The trial court cautioned that the photographs could not be used to testify that the employees appeared to be straightening out the rod, and stated it would receive the photographs provisionally subject to Mrs. Fair later testifying as to their authenticity. Defense counsel objected on the ground of subsequent remedial measures. The trial court overruled the objection in terms of allowing in the photographs.

------

[16] During his opening statement, Fair's counsel asserted that expert testimony would show that the probable cause of the bent rod was someone getting into or running through the switch and not reporting it, which allowed the switch to be in a defective condition, injuring Fair. Fair's counsel then stated: "The rod was out of adjustment. The eyelet where the rod connects was out of adjustment. The switch needed to be lubed. It needed to be cleaned. Switch points have rollers, the rollers needed to be adjusted. Major work was required because of the defect of this switch, which is an indication of poor maintenance for months." After Fair's counsel completed the opening statement, defense counsel moved for a mistrial, based in part on these statements, arguing they constituted a "textbook definition of using subsequent remedial measures to prove negligence," and were a blatant violation of the rules of evidence. The trial court took the motion under advisement. Two days later, the trial court denied the motion, but offered to admonish the jury, although the trial court preferred to leave it alone at that point. Defense counsel agreed with the trial court's preference. While BNSF discusses the mistrial motion on appeal, it does not argue that the trial court erred in denying the mistrial motion.

Duffany testified about both the inspection report and the photographs. As to the inspection report, Duffany confirmed that he reviewed the report, which Johnson prepared as a consequence of Fair's injury, as part of his work on the case, and that he relied on the report, in part, in formulating his opinions and conclusions in the case. Duffany agreed the report contained an objective evaluation of the forces necessary to throw the switch after Fair was injured. Duffany explained that when the employees measured the forces needed to operate the switch shortly after the accident, they found the push down, meaning when the switch handle was pushed over to the right and in the push down position, was in the "red range." This was the only document Duffany had seen with regard to any detailed inspection of the switch on the date of the accident. Duffany opined that the switch was not operating properly because the switch rod was bent, the switch plates were not cleaned and lubricated, and the eyelet, connecting rod, and roller were all out of adjustment. This opinion was based on other photographs of the switch, Fair's statement that he observed a bent rod, and Johnson's inspection report, which did not acknowledge the bent rod.

Duffany also testified he had reviewed the two photographs the trial court allowed into evidence. Fair's counsel asked Duffany whether there was any reason for an employee to stand on a switch handle; Duffany responded, "No reason at all." Duffany further testified that based on his review of the documents, including the photographs, the inspection report, and the deposition testimony, his opinion was that the switch was not safe to operate on the day of the accident.

Johnson confirmed that he generated the inspection report, which showed he began working on the report at 5:30 a.m., and that the document was one he would generate and keep in the normal course of business when he performed an inspection following an injury. Johnson also confirmed that part of his responsibilities after a reported injury on a switch is to perform a visual inspection of the switch and its component parts. Johnson never wrote anything down in his report about a bent

31.

connecting rod and did not remember if the rod was bent. Based on the report, Johnson knew there was a problem with the connecting rod. They adjusted the rod, which may have left a gap which required adjustment of the eyelet. Johnson had no reason to believe he did not accurately report the torque readings on the report. The trial court received the report into evidence over defense counsel's subsequent remedial measure objection.

Johnson was then asked more specifically about the report. He wrote in the report that the switch stand handle was torqued with a torque wrench, but he did not describe the condition of the parts. Johnson testified about the torque measurements he took; he admitted that the measurement of 130 pounds when pushing down towards the right was in the "red zone[,]" which meant the switch needed to be repaired.

Fair's wife, Shari Fair, testified that after Fair was injured, she picked him up at the railroad and took him home. When Fair's pain did not lessen or go away, they decided to seek medical attention at an urgent care. Because they could not get into the urgent care for at least an hour and Shari wanted to see where Fair had gotten hurt, they drove by the railroad yard. From an overpass, Shari saw a maintenance truck arrive at the yard and some guys get out. Shari took pictures with a camera she always kept in the car. Shari confirmed that she took the two photographs that were in evidence. She did not know why the man in one photo was standing on the switch; Shari testified he "kind of looked like he was a pogo stick, he was just going up and down." She estimated he was on the switch for about three seconds. When asked if she knew how long a man in the other photograph was pushing on the switch, Shari answered that "[t]hey did that a lot[.]"

During the cross-examination of the defense's biomechanist expert, Shimada, Fair's counsel asked if he knew what the guy was doing standing on the switch handle; Shimada did not know. Shimada agreed that Johnson measured the switch using a torque wrench after Fair was injured. Shimada did not recall if Johnson ever indicated he was able to get the switch handle locked during his initial evaluation after the accident.

32.

During closing arguments, Fair's counsel showed the jurors the two photographs and argued the jury should discount Shimada's testimony because the body position he assumed Fair used when throwing the switch was not consistent with the position of the man in the photographs. Defense counsel objected to the use of the photographs for this purpose, as they did not show people throwing switches; instead, they showed people inspecting switches. Fair's counsel argued there was no problem with using the photographs as he used them for demonstrative purposes to show the difference in body position from what Shimada used. The trial court told defense counsel that it would give an admonition if counsel provided one.

The trial court subsequently told the jury, with the admonishment defense counsel prepared, that during his summation, Fair's counsel argued that the two photographs "depicted a railroader attempting to throw the 5176 switch even though there is no evidence that these photographs depict anyone throwing the switch. These photographs depict an inspection of the switch, and you are not to consider those photographs as depicting any railroader throwing the 5176 switch or depicting the manner in which Mr. Fair may have thrown the 5176 switch on the night of this incident."

In his subsequent rebuttal, Fair's counsel argued that it was interesting that BNSF found the rod needed adjustment: "Why? Because it was bent. No, they didn't say that it was bent, the photographs show that, which I'll show that to you in a second. They needed to adjust the eyelet, the roller, lubed and cleaned the switch. Torque readings afterwards, there's eight torque readings there; six of them are in the yellow zone. They left the switch in their own yellow zone. Why? Because the switch was bad."

C. Analysis

BNSF contends the trial court abused its discretion "by wholly ignoring [Evidence Code] section 1151[,]" as it failed "to impose *any* limitation on Mr. Fair's introduction of evidence and argument relating to BNSF's repairs to the 5176 switch." We disagree with BNSF's characterization of the record. As set forth above, the trial court did not ignore

33.

Evidence Code section 1151; instead, it recognized that the statute prohibits the use of repair evidence to prove negligence, and accordingly limited the proferred evidence to that which showed inspections, not repairs. With respect to the two photographs, there is nothing in the record to suggest that they show repairs. Instead, the photographs show employees standing around the switch, with one employee standing on or over the switch. The record also shows that Fair's counsel did not use the photographs to show repairs. Instead, his questions about the photographs centered on why an employee would be standing on the switch – questions no one could answer. Moreover, the jury was told in the admonishment that the photographs showed an inspection of the switch. Since the photographs did not show repairs, they were not inadmissible under Evidence Code section 1151.

With respect to the inspection report, it also was admissible as evidence of investigation. Certainly the part of the report that states what was inspected, namely that the switch stand handle was torqued, and the torque wrench readings, are part of the inspection and therefore are admissible. While the information listed under the "repairs" section, including the adjustments that were made to the rod, eyelet and roller, the lubrication and cleaning of the switch, and the subsequent torque readings could be viewed as repairs, the information was used at trial, not to prove negligence, but to prove the switch had a defective condition which caused Fair's injury. (See 46 Cal.Jur.3d Subsequent Repairs or Precautions, § 215 [evidence of a condition before and after the accident, which tends to establish the cause of the accident by showing that when the condition was changed the trouble was removed, is admissible and is not within the class of evidence to be excluded under Evidence Code section 1151, citing *Dow v. Sunset Telephone & Telegraph Co.* (1910) 157 Cal. 182].)

All of the argument and testimony described above shows that Fair's counsel used the inspection report to show the defective condition of the switch, not to prove that

BNSF was negligent. Accordingly, the trial court did not abuse its discretion in admitting the report. There is no error.

V. Sarkisian's Testimony

BNSF next contends the trial court erred in failing to exclude the testimony of Fair's vocational rehabilitation expert, Ricky Alan Sarkisian, Ph.D., on two different grounds. First, BNSF asserts Sarkisian should not have been permitted to offer testimony concerning two possible scenarios for Fair's future employment, namely part-time employment and full unemployment, as those are not supported by the necessary foundation in the medical testimony. Second, BNSF argues the trial court should have excluded Sarkisian's testimony in its entirety because Sarkisian, who in conformance with his typical practice destroyed his handwritten notes of his interviews of Fair after they were transcribed, did not produce those notes in discovery. We address each contention in turn.

A. The Vocational Rehabilitation Testimony

Before trial, BNSF moved in limine to prevent Sarkisian from testifying that Fair would be medically limited for the remainder of his life to either half-time work or unemployment. BNSF argued Sarkisian's opinion must be excluded because it lacked the requisite foundation, since he is not a medical doctor and one of Fair's medical doctors had opined there was nothing stopping Fair from returning to work at BNSF in a sedentary position. In opposition, Fair argued he was entitled to elicit from Sarkisian vocational opinions founded on Sarkisian's review and understanding of Fair's overall medical conditions, prognosis, ongoing physical limitations and pain complaints, and it was for the jury to decide which scenario was most likely to occur.

In oral argument on the motion, defense counsel asserted the motion presented the issue of whether a vocational rehabilitation expert can offer opinions based on work restrictions that are unsupported by any medical testimony, and argued there was no

support for Sarkisian's assumption that Fair could not return to work in a full-time capacity. The trial court denied the motion.

At trial, the doctor treating Fair for his back injury, Smith, testified that Fair was going through a protracted attempt at conservative treatment, which included physical therapy and numerous injections to his back. Through injections, Smith was trying to determine where Fair's pain was coming from to see if it could be reduced or eliminated; this would allow Smith to develop a rehabilitation program designed to get Fair back to a functional status and return him to work. Fair had not been getting long-lasting relief from the pain injections. If future injections did not provide relief and Fair could not progress in physical therapy, which in the past had made Fair's pain worse, then it was unlikely Smith would be able to control Fair's pain well enough to enable Fair to get over his problem and return to work, unless something changed.

If the efforts at conservative treatment failed and Fair could not tolerate the pain, the only option left was surgery, which could be either surgery to decompress the nerve or a spinal fusion. At that point, Smith would send Fair to a surgeon to discuss the possibilities. It was up to Fair, however, whether to have surgery. Fair was a chronic pain patient who had been experiencing pain for two years; such patients continue to have problems which they cannot completely eliminate. Smith explained that Fair had been off work for a long period of time, and chronic pain enters into that picture in terms of getting him back to work. At the time of trial, Fair still had pain associated with his disk.

Fair had bariatric surgery to help him lose weight in an effort to relieve his symptoms; Smith wanted to see if the weight loss was effective before determining Fair's future course of treatment. If the knee improved enough for Fair to function normally, then Smith wanted to see if Fair would improve under a rehabilitation program; if not, he might try another injection to see if a different approach to physical therapy could be attempted. With respect to Fair's activities, Smith recommended that he change positions frequently, as Fair's pain increased when sitting, and that he get some aerobic exercise.

Smith had seen the need for changes of position frequently in patients, including lying down; these were factors that needed to be taken into consideration with regard to future work. Smith, however, had not rendered any specific opinions regarding if and when Fair could return to work; he was still treating Fair and had not released him back to work.

Dr. David Taylor, an orthopedic surgeon, performed two knee surgeries on Fair, one to repair a torn meniscus and the second to rebuild Fair's anterior cruciate ligament (ACL). After the ACL surgery, Fair's knee was more stable, but he still had knee pain; his knee hurt while going up and down stairs, sitting for long periods of time, and walking. Taylor did not expect the knee to get better; the weight loss would help prevent the knee from wearing out. Dr. Taylor had determined Fair could not return to work as a railroad engineer or conductor, as it was highly unlikely he would ever be able to do unrestricted work activities. Taylor believed Fair could return to work with strict modifications, but if those modifications could not be adhered to, he would be considered disabled.

As of May 2012, Taylor determined that Fair was temporarily totally disabled if no modified work was available. Restrictions included: no walking on uneven slippery ground; no lifting greater than 10 pounds; no bending, squatting or kneeling; no prolonged sitting or standing; no climbing greater than 20 feet; and to alternate sitting and standing every 10 minutes, i.e. sit for 10 minutes, stand for 10 minutes. Taylor testified Fair's knee was permanent and stationary, and these restrictions were permanent. With regard to Fair's knee, Taylor did not see any reason Fair could not do work that allowed him to get up and move around. In June 2013, when he knew Fair was going to have the bariatric procedure, Taylor determined Fair remained temporarily totally disabled for six months, meaning Fair could not do anything until at least December 2013. It was most likely that Fair would have to continue taking opioid or other pain medications for the remainder of his life, and that he would require a total knee replacement within 10 years.

Sarkisian testified at trial that as a vocational rehabilitation consultant, he looks at a case and determines (1) what the person was capable of doing and earning in the job market before the injury, and (2) what work the person can do, and at what level, after the injury. In evaluating a person's potential employability, Sarkisian considers whether the job is appropriate for them medically, academically and in terms of the appropriate environment, which involves a compatibility with the person's disability, medical condition and innate abilities, as well as the availability of jobs.

Based on Sarkisian's evaluation of the doctors' testimonies and his interviews of Fair, Sarkisian believed Fair was not at the point where he could begin vocational rehabilitation work; Sarkisian's opinion at trial was limited to his evaluation of Fair's residual capacity, and if and when he could get to that point, including whether he could work. Sarkisian's normal methodology when evaluating someone like Fair is to thoroughly understand the medical records, because Sarkisian is not a physician and those records are "the concrete slab on which I'm going to build my vocational house." Sarkisian also interviews the injured person, and tests them in the areas of academic skills, aptitude and interests. Finally, he reviews the jobs data to determine available jobs in the pertinent geographical area, which in this case was Fresno.

In rendering his opinion in this case, Sarkisian reviewed Fair's medical and employment records, and the deposition testimony of Fair's doctors, Taylor and Smith. Sarkisian interviewed Fair twice before trial, on February 26 and August 10, 2013. From the first interview, Sarkisian learned that Fair was "very functionally disabled," with constant pain down his left leg, constant pain and swelling in his left knee; he had numerous areas of limitation, including lifting, carrying, bending, twisting, pushing, pulling, walking, standing, sitting, driving, squatting, kneeling and climbing. Fair also described significantly impaired stamina and physical tolerance levels; he would lay down frequently, about five to six times a day for a half an hour to two hours at a time. At the second interview six months later, Fair was essentially the same; he had intense

38.

back pain even while lying on his side, his knee pain continued, he could not sleep, and was still lying down frequently during the day.

Sarkisian was not surprised that Taylor opined Fair was temporarily totally disabled and that Smith had not released Fair to engage in any vocational activities. Consistent with Taylor's opinion, Fair did not feel physically capable of any form of employment, but he was open to vocational guidance once his medical condition stabilized. With respect to Fair's potential for work based on his physical condition, Fair was particularly concerned about his stamina. In addition, Fair had a "dilemma" between sedentary, or sit-down, work, and semi-sedentary work, which involves sitting, standing and walking, since Fair could not sit very long because of his low back pain and could not be on his feet very long because of his left knee pain. This conflict had yet to be resolved and presented a problem for Sarkisian, as once a doctor releases Fair, an employer would have to be very sympathetic and willing to accommodate this dilemma by allowing Fair to change positions throughout the day to accommodate Fair's inability to sit or be on his feet too long. This presented a significant challenge due to the unemployment rate in Fresno.

Sarkisian opined that before Fair's injury, he was maximizing his earning potential by working as a railroad engineer or conductor. With respect to Fair's post-accident earning capacity, Fair would be up for re-evaluation of his ability to return to work in December 2013. To be able to return to full-time work at that time, one would have to assume Fair could work in the range of 20 to 40 hours per week in either a sedentary position, defined as spending 90 percent of the work shift in a seated position, or a semi-sedentary position, defined as spending 50 percent of the work shift in a weight-bearing position, such as walking or standing. If Fair could get through the workday, Sarkisian proposed he obtain clerical or business skills through a community college or an adult school; he believed Fair could be trained to be a bookkeeping clerk, billing clerk, cost clerk or a dispatcher. Sarkisian opined Fair would need 12 months of training and six

months for a job search, which meant that if he was released to work in December 2013, he would not begin full-time work until June 2015. If Fair had the ability to work full-time, he would maximize his post-injury earning capacity.

Sarkisian also considered two other scenarios. One scenario was for half-time work because of Fair's pain and limited stamina, and the other for zero employment and earning capacity as a consequence of his continued medical problems. Sarkisian confirmed that if Fair did not get better, he would not be able to work, and in order to be able to work, he would have to improve significantly. The three scenarios were based on whether Fair would be able to significantly improve to the point where he could sustain the things needed for full-time work, such as stamina and focus.

Defense counsel renewed his objection to Sarkisian's testimony as to the second and third scenarios, which was discussed outside the jury's presence. Defense counsel argued those scenarios were based on speculation; while Fair may not be able to return to work after December, it was Fair's burden to put on medical evidence that it was more probable than not that he would not be able to work past December 2013. Without such evidence, Sarkisian's opinion was improper. Fair's counsel responded that while Fair was disabled until December 2013, based on the various contingent scenarios of how well Fair would be able to recover from the bariatric procedure, participate in physical therapy, and whether he needed back surgery, Sarkisian was qualified and able to opine to a reasonable degree of vocational probability whether thereafter Fair would be able to work full-time, part-time or not at all. The jury could then evaluate the scenarios and come to a conclusion on them. The trial court asked defense counsel whether his position was, because no evidence was presented about Fair's condition after December 2013, Fair should be able to go back to work on January 1, 2014. Defense counsel responded that was correct, as there had been no evidence to support Sarkisian's expert testimony on scenarios two and three. The trial court overruled the objection.

On cross-examination, defense counsel asked if it would be appropriate for Fair to consider a semi-sedentary position at BNSF in the Fresno area if one were available. Sarkisian responded that with the "dilemma" he already testified to, he was not certain Fair could tolerate semi-sedentary employment, as he would have to be on his feet half the work shift. Sarkisian thought it "beg[ged] for a medical opinion," as he did not know how to resolve the issue. Sarkisian agreed that if there were positions that doctors agreed Fair was medically physically capable of doing at BNSF in the Fresno area, Fair ought to consider them.

Sarkisian testified that all three scenarios were dependent on a doctor's opinion. Sarkisian had not seen any medical record that restricted Fair to half-time work, but explained that since Fair was totally disabled, to get to full-time work Sarkisian would have to assume Fair finally gets "out of this total disability state and is medically cleared to work full time." Sarkisian acknowledged he did not know what the opinion of Fair's ability to work would be in December 2013.

Sarkisian refers to clients who cannot return to work due to a plethora of medical problems as not feasible for rehabilitation services. He would not classify a client as non-feasible without medical support; however, someone can be medically capable of rehabilitation but fail for other reasons, such as low test scores, a terrible job market or a bad attitude. Sarkisian confirmed "the medical opinion is the foundation on which you build the vocational house." Sarkisian had not labeled Fair as non-feasible.

On re-direct, Sarkisian testified that if Fair was medically capable of work and got the training he suggested, it was more likely than not that Fair would get a job. Sarkisian confirmed Taylor's permanent restrictions would be in place if Fair were released to work, and he would have to compete for jobs against people without restrictions. These restrictions were only for Fair's knee and did not include the low back issue; additional restrictions would depend on the outcome of physical therapy after Fair's weight loss. Sarkisian believed Fair had an uphill climb in obtaining employment due to the

41.

restriction that called for him to alternate sitting and standing every 10 minutes; this restriction may very well limit access to the jobs Sarkisian identified.

Based on Sarkisian's report, Fair's forensic economist rendered opinions concerning Fair's lost earnings capacity assuming Fair could work full-time, half-time, or not at all, based on Fair's 2009 and 2010 wages. Using Fair's 2009 wages as a base, the economist opined that Fair's lost earnings capacity was $1,407,421 for full-time work, $1,657,503 for part-time work, and $1,896,034 for no work; these numbers included past losses of $262,567. Based on Fair's 2010 wages, Fair's lost earnings capacity was $1,046,733 for full-time work, $1,296,815 for half-time work, and $1,535,346 for no work; these numbers included past losses of $210,886.

BNSF contends the trial court abused its discretion in refusing to exclude Sarkisian's testimony regarding Fair's future work restrictions because there is no competent evidence to support that testimony. In support, BNSF cites the principle that an expert's opinion based on assumptions of fact without evidentiary support has no evidentiary value and may be excluded from evidence. (*Dee v. PCS Property Management, Inc.* (2009) 174 Cal.App.4th 390, 404.) BNSF argues that Sarkisian's opinions as to the second and third scenarios should have been excluded because they are unsupported by any medical testimony, since neither Taylor nor Smith testified Fair's medical condition prevented him from returning to work or required him to return in a part-time capacity.

We find no abuse of discretion. BNSF's argument is premised on its assumption that Sarkisian determined Fair was either medically incapable of returning to work at all or medically incapable of working no more than part-time for the remainder of his life. However, a review of Sarkisian's testimony, as summarized above, shows that Sarkisian made no such determination; instead, Sarkisian merely testified that the no work and half-time scenarios should be considered if Fair's condition does not improve, or Fair's pain and stamina limits him to half-time work. Sarkisian did not opine, as BNSF implies, that

42.

Fair would not improve to the point that he could engage in full-time work. Instead, Sarkisian recognized that each scenario was dependent on what a doctor may say in the future, as well as Fair's subjective pain.

Contrary to BNSF's argument, there was medical evidence to support the scenarios Sarkisian proposed. With respect to the inability to work in the future, Taylor testified that if the modifications and restrictions he authorized for Fair could not be adhered to, he would consider Fair totally disabled. Sarkisian opined that it would be difficult for Fair to obtain employment with Taylor's restrictions in place, and the restriction that required Fair to alternate sitting and standing every 10 minutes may very well limit Fair's access to the jobs Sarkisian identified. (See, e.g., *Moore v. American United Life Ins. Co.* (1984) 150 Cal.App.3d 610, 630 [expert testimony of a rehabilitation counselor that the plaintiff's physical disability precluded her from finding and holding a job due, in part, to the plaintiff's questionable actual employment prospects is relevant to show that the plaintiff cannot work with reasonable continuity].) Sarkisian's opinion concerning half-time work was based on Taylor's restrictions, Sarkisian's observations of Fair during his interview of Fair, and Fair's concern about his stamina. Thus, there was evidence to support Sarkisian's opinions on the second and third scenarios, and no abuse of discretion in admitting this testimony.

B. Motion to Exclude Sarkisian's Testimony

BNSF moved in limine to exclude Sarkisian's opinions at trial based on the destruction of his handwritten notes taken during his work-up of the case. BNSF asserted that after Sarkisian was disclosed as an expert in the case, it noticed Sarkisian's deposition on August 2, 2013 and requested that he produce all writings he created. At his August 12, 2013 deposition, Sarkisian testified that he took handwritten notes during his interview with Fair, which were dictated and a file memorandum created. Once the notes were transcribed and in his working file, the handwritten notes were tossed. When asked if he had the handwritten notes from this case, Sarkisian responded that they were

43.

"tossed," "thrown away," "discarded" and "long gone." Sarkisian understood when he was taking the notes that he was performing services in anticipation of trial. He threw the notes away in accordance with his practice of 35 years, because there was no need to keep them, as his files were "complex enough." Fair's counsel had never instructed him to keep all his notes for this case. BNSF argued that Sarkisian's practice of intentionally destroying evidence of his contemporaneous impressions ran afoul of the expert disclosure requirements of Code of Civil Procedure section 2034.270, and required the trial court to exclude Sarkisian as a witness under Code of Civil Procedure section 2034.300.

In opposition, Fair argued BNSF suffered no prejudice from Sarkisian transferring his handwritten notes into typewritten form, since the substance of the client interview was produced and transcribed, and there was nothing in the statutes BNSF cited requiring an expert witness to maintain every writing he generated.

At the outset of oral argument on the motion, the trial court stated its tentative ruling was to deny it, but asked if counsel wanted to be heard. Defense counsel argued the issue was whether handwritten notes of an expert taken during an interview are discoverable; if they are, then they were required to be produced under Code of Civil Procedure section 2034.270 and the failure to produce the notes is a basis for excluding Sarkisian's testimony under section 2034.300. The trial court stated its only concern was whether the notes were destroyed before BNSF requested production of the documents. Defense counsel responded that he did not know when Sarkisian destroyed the notes, but he had a statutory obligation to maintain them as they were discoverable writings. The trial court responded that a document is only a discoverable writing if it existed.

Fair's counsel stated the request was made after Sarkisian prepared his report, and that Sarkisian did what he has done for 35 years – he did an interview, took handwritten notes, immediately generated his report, and once he was satisfied the report reflected the notes, he destroyed them. Fair's counsel asserted this was a subject for cross-

44.

examination, but not exclusion. Defense counsel stated that Fair's counsel's representation regarding the timing of the document request was not true, as Sarkisian met with Fair on August 8 for a second time and took a second set of notes, and since the deposition notice was sent before August 8, to the extent those notes were destroyed after the second meeting, they were destroyed with a pending document request. The trial court then denied the motion without explanation.

At trial, Sarkisian testified on cross-examination that he did not tape record or videotape his February interview of Fair, as that was not his practice. His practice is to make handwritten notes, which he tosses once they are dictated. Fair's attorneys did not ask him to keep his handwritten notes and he had not provided them to defense counsel, as Sarkisian did not have them since they were gone. Sarkisian dictated them into a recording; he did not have the recording, since once it is transcribed, his secretary moves on to the next recording.

Code of Civil Procedure section 2034.300 provides, in relevant part: "[O]n objection of any party who has made a complete and timely compliance with Section 2034.260, the trial court shall exclude from evidence the expert opinion of any witness that is offered by any party who has *unreasonably* failed to do any of the following: [¶'s] . . . (c) Produce reports and writing of expert witnesses under Section 2034.270. . . ." Code of Civil Procedure section 2034.270 provides, in pertinent part, when "a demand for an exchange of information concerning expert trial witnesses includes a demand for production of reports and writings as described in subdivision (c) of Section 2034.210, all parties shall produce and exchange . . . all discoverable reports and writings, if any, made by any designated expert . . . ." [17] We generally review the trial court's ruling on a

---

[17] Code of Civil Procedure section 2034.210, subdivision (c) provides that when a party demands a simultaneous exchange of information concerning expert trial witnesses, the party "may also include a demand for the mutual and simultaneous production . . . of all discoverable reports and writings, if any, made by an expert witness described in subdivision (b) in the course of preparing that expert's opinion."

motion to exclude an expert's opinion for abuse of discretion, unless the exclusion rests on a matter of statutory interpretation, which is subject to de novo review. (*Boston v. Penny Lane Centers, Inc.* (2009) 170 Cal.App.4th 936, 950 (*Boston*).)

BNSF argues that in denying the motion, the trial court created an "unsupported exception to section 2034.300, subdivision (c) that allows an expert to destroy discoverable writings created in anticipation of trial at any time before a formal request is made by the opposing party." BNSF asserts that Code of Civil Procedure section 2034.300, subdivision (c) makes no such exception, and instead mandates exclusion of expert testimony when the *expert* has unreasonably failed to produce the writings the expert *made*, not just writings the expert *retained*. BNSF further asserts that the trial court did not reach the issue of whether Fair's failure to produce the handwritten notes was unreasonable, but even if it had, it was unreasonable for Sarkisian to destroy the notes since he knew, due to his decades of experience as an expert witness, that the notes were discoverable and crucial to his testimony, and the notes' destruction deprived BNSF of the opportunity to fully and fairly cross-examine him on his assumptions.

Fair responds that the trial court did not abuse its discretion in admitting Sarkisian's testimony because Fair did not unreasonably fail to produce Sarkisian's handwritten notes.[18] We agree. Although a Code of Civil Procedure section 2034.300 motion does not provide explicit guidance as to how a court should decide whether a party's failure was reasonable or unreasonable, the record here supports the trial court's

---

[18] BNSF asserts that the trial court did not reach the issue of reasonableness in ruling on the motion because it decided the statute did not apply. The record, however, is not clear on the basis for the trial court's ruling; it shows only that in argument on the motion the trial court expressed its concern about when the notes were destroyed. Given the silent record, we presume the trial court ruled on the reasonableness of Fair's failure to provide BNSF with the handwritten notes. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [all presumptions indulged to support judgment on matters as to which record is silent].)

implicit conclusion that Fair did not behave so unreasonably as to warrant exclusion of Sarkisian's testimony.

Appellate courts have found a failure to comply with expert designation rules to be "unreasonable" when, for example, a party's conduct gives the appearance of gamesmanship, such as undue rigidity in responding to expert scheduling issues. (*Stanchfield v. Hamer Toyota, Inc.* (1995) 37 Cal.App.4th 1495, 1504 (*Stanchfield*).)  The operative inquiry is whether the conduct being evaluated will compromise these evident purposes of the discovery statutes: "'to assist the parties and the trier of fact in ascertaining the truth; to encourage settlement by educating the parties as to the strengths of their claims and defenses; to expedite and facilitate preparation and trial; to prevent delay; and to safeguard against surprise.'"  (*Ibid.* [holding that the trial court did not abuse its discretion in allowing expert testimony].)

In another case, the conduct being evaluated was a party's noncompliance with statutory disclosure requirements by producing late, incomplete expert witness information and refusing to make the experts available for deposition.  (*Zellerino v. Brown* (1991) 235 Cal.App.3d 1097, 1116-1117 (*Zellerino*).)  This amounted to "a comprehensive attempt to thwart the opposition from legitimate and necessary discovery," justifying exclusion of the experts' testimony.  (*Id.* at pp. 1117-1118; see *Stanchfield, supra,* 37 Cal.App.4th at pp. 1504–1505.)

In *Boston*, *supra*, 170 Cal.App.4th 936, the defendant sought to exclude the testimony of the plaintiff's expert witnesses because the plaintiff did not produce their reports and writings until after the specified date for the mutual exchange of information; the plaintiff asserted this was because the reports and writings did not exist at the specified date.  (*Id.* at pp. 948-949.)  Although the appellate court concluded there was no statutory prohibition against creation of expert reports and writings after the specified exchange date, it noted the trial court was not powerless to prevent or respond to abuse of expert witness discovery procedures.  (*Id.* at p. 952.)  The court pointed to Code of Civil

Procedure section 2034.300 as empowering the trial court to exercise its discretion to exclude expert opinion when the party offering it "has *unreasonably* failed to produce expert reports and writings." (*Boston, supra,* at p. 952, citing Code Civ. Proc., §§ 2034.270, 2034.300, subd. (c).) The court explained: "If the trial court concludes that a party intentionally manipulated the discovery process to ensure that expert reports and writings were not created until after the specified date, it may find the failure to produce the reports and writings was unreasonable and exclude the expert's opinions. Accordingly, a party who fails to instruct its expert to create all reports and writings before the specified date does so at its own risk." (*Boston, supra,* at p. 952.)

In this case, there was nothing before the trial court during the in limine hearing to suggest that Fair or his counsel engaged in either a pattern of behavior designed to impede expert discovery or gamesmanship; neither was there evidence they instructed Sarkisian to destroy the notes. [19] At best, the record shows that Fair did not advise Sarkisian to retain his notes. But there is no evidence that this failure was the result of bad faith. Instead, it appears that Sarkisian destroyed his notes in accordance with his usual practice, which had never been called into question. Although the better practice would have been to instruct Sarkisian to retain his notes, the failure to do so does not show an attempt to thwart BNSF's discovery.

In sum, the trial court did not abuse its discretion in allowing Sarkisian to testify.

VI. Award for Future Economic Loss

BNSF contends we should modify the trial court's judgment to delete the $1,500,000 the jury awarded Fair for "future economic loss, including lost [w]ages and

---

[19] In its argument, BNSF focuses on Sarkisian's act of destroying the notes, arguing that he was unreasonable in doing so. But the relevant inquiry under Code of Civil Procedure section 2034.300 is whether the *party* "unreasonably failed" to do the things listed in that section, including producing the "reports and writings of expert witnesses[,]" not whether the expert's acts were reasonable. (Code Civ. Proc., § 2034.300, subd. (c).)

fringe benefits[,]" because there is no evidence to support the award. BNSF points out that in California, there is a distinction between lost wages and lost earnings capacity, citing *Storrs v. Los Angeles Traction Co.* (1901) 134 Cal. 91, 93-94 and *Hilliard v. A.H. Robins Co.* (1983) 148 Cal.App.3d 374, 412, which distinction is recognized in the California Civil Jury Instructions. BNSF asserts the jury's award of $1,500,000 was for "lost wages," and because Fair's forensic economist specifically stated he was rendering an opinion on lost earnings capacity, not lost wages, there is no evidence to support this item of damages. We disagree.

Fair's forensic economist, Robert W. Johnson, evaluated the economic loss Fair suffered regarding his earnings capacity by quantifying in present value terms the economic loss of earnings capacity Fair suffered as a result of his injuries. Johnson accomplished this by splitting the calculation into two parts: (1) assuming the injury never occurred, what would have been Fair's loss of earnings capacity, i.e. his total compensation including wages and benefits, multiplied by the years remaining in his work life; and (2) as a result of the injury, what Fair was capable of making, i.e. his total compensation including wages and benefits, multiplied by the amount of time he could stay in the work force with that injury. This resulted in two numbers: (1) how much money Fair would have made if he had not been injured; and (2) what Fair was capable of making after the injury.

Johnson then subtracted the lower figure from the higher figure, resulting in the measure of Fair's loss of earning capacity. In making these calculations, Johnson also had to deduct for income taxes, which is unique to FELA cases, and reduce the figures to present value. As we have already explained, Johnson rendered opinions concerning Fair's lost earnings capacity assuming Fair could work full-time, half-time, or not at all, based on Fair's 2009 and 2010 wages. For example, based on Fair's 2010 wages, Johnson determined Fair's lost earnings capacity was $1,535,346 assuming Johnson could not return to work.

Johnson confirmed on cross-examination that he was not testifying about Fair's lost earnings or future lost wages, he was offering an opinion as to his lost earnings capacity. The two can be different; lost earnings or wages would be, for example, an employee's hourly wage of $10 per hour multiplied by two hours of lost work, while loss of earning capacity is what the employee would have had the capacity to make if he or she could not work anymore; the second figure is more than the two hours of lost wages – it is what he or she would have been able to do for the rest of his or her work life.

With respect to economic damages, the jury was instructed with CACI No. 3903, which stated, in pertinent part, that Fair was claiming as a specific item of economic damages: "C. The loss of Mr. Fair's ability to earn money. [¶] To recover damages for the loss of the ability to earn money, Mr. Fair must prove the amount of money he would have been reasonably certain to earn if the injury had not occurred. It is not necessary that he have a work history."

The trial court gave the jury Fair's proposed special verdict form over defense counsel's objection to the line under damages entitled "Future economic loss, including lost wages and fringe benefits." Defense counsel argued that because Fair's claim was for lost earnings capacity, which under FELA is a general damage, lost earnings capacity should not be included in the special damages section as an economic loss; instead, to prevent the jury from "double dipping," this item should be listed under general damages as a non-economic loss. Defense counsel recommended that future economic loss and lost wages be taken out, since there was no claim for lost wages, and lost earning capacity inserted under the line for future non-economic loss. The trial court overruled the objection, stating it was not terribly concerned the jury would inflate the general damages in light of the prior line for lost earnings capacity and its confidence that defense counsel would argue to the jury that such damages could not be awarded twice.

In closing argument, Fair's counsel argued that for "future economic loss," the jury should consider Johnson's summary totals. Fair's counsel urged the jury to consider

50.

the risk of Fair not being able to work and to be reasonably certain that whatever number they wrote down, Fair would be able to generate that as part of his income over the rest of his work life. Defense counsel, in closing, reminded the jurors that the question was not what Fair had "lost in earnings," but his lost earning capacity. When the jury returned the special verdict form, it awarded Fair $1,500,000 for "Future economic loss, including lost [w]ages and fringe benefits."

BNSF contends that the jury's award was for "lost wages," and because Johnson testified he was not offering an opinion as to lost wages, there is no evidence to support the award. The special verdict form, however, does not state that this item was solely for "lost wages"; it states it was for "future economic loss," *including* "lost wages and fringe benefits." This wording is consistent with Johnson's testimony that he used Fair's projected wages and fringe benefits to determine Fair's lost earnings capacity. As Johnson confirmed, he calculated the total amount of compensation necessary to balance out Fair's economic loss from the date of the injury to his assumed retirement date at age 66, and then for the remainder of his life. The jury was instructed to award damages based on Fair's loss of ability to earn money, not on lost wages. It was further instructed not to speculate or guess in awarding damages. We presume the jury understood and applied the instructions given. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803-804.)

As we interpret the special verdict, there is nothing on its face indicating the jury's award of future economic damages is in any manner inconsistent with Johnson's testimony or contrary to the trial court's directions. (*Fernandez v. Consolidated Fisheries, Inc.* (1953) 117 Cal.App.2d 254, 263 [the trial judge's function is to "interpret the verdict from its language considered in connection with the pleadings, evidence and instructions."].) It does not follow from the fact the verdict form includes "lost wages" as a part of "future economic loss" that the jury impermissibly awarded an amount for "lost wages," which Johnson expressly disclaimed he had calculated, as opposed to lost

51.

earnings capacity, which Johnson did calculate. BNSF does not point to anything in the record indicating the jury was confused in its decision making on the damage issues; the mere theoretical possibility that the jury misunderstood the verdict form is not enough to require reversal of the damage award, which is supported by the evidence.

## **DISPOSITION**

The judgment is affirmed. Costs on appeal are awarded to respondent.


_____
GOMES, J.

WE CONCUR:


_____
HILL, P.J.


_____
LEVY, J.